## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Brook A. Higgins,                                              Case No: 13-

                          Plaintiff.                           Hon.

v.

Western Michigan University

                          Defendant                           **Plaintiffs demand a jury**

## COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, Brook Higgins, by and through his attorneys, FIXEL LAW

OFFICES, PLLC, for his complaint against Western Michigan University, ("Defendant

WMU"), hereby allege as follows:


## PRELIMINARY STATEMENT

1. This case involves the intentional discrimination of an adult student attending the
   University in violation of Section 504 of the Rehabilitation Act.


## Parties

2. Brook Higgins is an adult attending classes at Defendant WMU and lives and resides in
   Portage, Michigan.

3. Defendant WMU is a public university in Kalamazoo, Michigan that receives Federal
   Funding for some or all of its programs.

1

## JURISDICTION AND VENUE

4. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

5. Venue in this judicial district is proper under 28 U.S.C. §1391 (b) (1) because
   Defendants have offices in this district and under 28 U.S.C. §1391 (b)(2) because a
   substantial part of the events complained of took place in this district.

## PLAINTIFF BROOK HIGGINS

6. Plaintiff Brook Higgins was diagnosed with learning disabilities in the third grade. At
   that time and over the subsequent years he was diagnosed with central auditory
   processing disorder, anxiety disorder, learning disabilities and math and science concept
   disabilities.

7. Part of the impact of these disabilities was that Brook is painfully shy and cannot
   understand how to process events and how to respond in a quick enough manner to
   advocate for himself.

8. One place that Brook excelled was on the basketball court and in football. He stood
   out on both teams.

9. Barbara and Neal Higgins (Brook's parents) have worked hard over the years to
   understand each of Brook's disabilities and how to assist him in his academic and later
   sports related goals.

10. Barbara and Neal Higgins have provided tutors for Brooks since he was in middle
    school.

11. As Brook entered High School he set his sights on becoming NCAA certified.

12. To achieve his goal, Barbara and Neal Higgins had to provide additional outside
    tutoring to meet the additional educational requirements to help Brook qualify for the
    NCAA.

2

13. Brook became a varsity football player in 10th grade and led his team for three (3) years straight in tackles.

14. In the summers of his 11th and 12th grades of High School, all of the Plaintiffs met with the Defendant's football coaches to determine how to get Brook on the WMU football team and what the requirements would be from the NCAA.

15. Brook registered with the NCAA disabilities department and took college classes to ensure that he had the 16 core credit hours required by the NCAA.

16. Barbara and Neal Higgins found additional tutors for their son to help him reach his goals.

17. Brook Higgins graduated High School with a 2.3 Grade Point Average. He then went to Kalamazoo Valley Community College (KVCC) and graduated with a 3.3 Grade Point Average and the required 16 credit hours for the NCAA clearance.

18. While at KVCC, Brook attended every game and every practice even though he hadn't been accepted yet to Defendant WMU. He also worked out every day at the club owned Defendant WMU despite not having yet been accepted indicating his dedication to being on the team.

19. On or about July 2012, Brook Higgins was accepted as a student to Defendant WMU. He registered with Jane Farley Burgett at Defendant WMU.

20. When Brook Higgins started at WMU he registered with the disability office on campus. Defendants were aware of his disabilities and learning needs. **(See Exhibit A)**

21. In August 2012, the Coach of the WMU football, Bill Cubit, told Brook Higgins he was accepted as a <u>preferred walk on</u> for the football team.

22. Brook Higgins was injured that fall with a knee injury. The linebacker coach told Brook that he was off of the team but after meeting with Coach Cubit who told him (Brook) to take a medical leave and keep his grades up so he could return in the fall.

23. Defendant WMU fired Coach Cubit after the last football game in 2012.

24. Brook Higgins completed that semester with a 3.88 GPA.

25. Brook and Neal Higgins spoke with the Assistant Athletic Director, Jeff Stone, before the start of the January 2013 semester.

26. Jeff Stone told both Brook and Neal Higgins that all looked fine for Brook Higgins to be on the team for the next year.

27. Brook met with the new coach and provided his contact information to the person who was to send out notices about team meetings and practices.

28. Brook Higgins waited for the department to send him a text (as was standard practice) to tell him when the first team meeting would take place. No text came.

29. Brook Higgins went to the field house and found that the meeting had taken place without him.

30. Brook attended the second team meeting and got information on when the workouts would begin.

31. A couple weeks into the workouts, Brook got sick and went to the Doctor and only went to the study table that evening.

32. The following morning, he was very ill and vomiting at 3:30 am but worried that he didn't have the coach's telephone number to let him know that he was sick.

33. Using the numbers provided to him, Brook sent a text to a team mate who was the squad leader to tell him that he was sick and couldn't go to the workout.

34. Brook had been provided the wrong number by the squad member to send a text to the Coach for information if he was sick and to let him know he wouldn't be attending the workout.

35. At role call that day, Brook Higgins was considered a no-call/no-show for not telling anyone that he wasn't going to make it to the team workout.

4

36. Later that day, the linebacker coach, Tim McGarigle, called Brook Higgins in and told him that because he didn't leave a message he was kicked off of the team.

37. Brook offered to show Coach McGarigle the text on his telephone, but was just told "you are lying".

38. When Brook, Barbara and Neal Higgins later spoke to Coach McGarigle, he commented "I didn't know about his disability. If I had it would have made a difference. We don't know you like you know Coach Cubit. I had to let a lot of guys go............*maybe they all have disabilities*."

39. The new head Coach P.J. Fleck called Brook later and asked to meet with him. Brook asked if he could also meet with his parents at the same time. Fleck responded "No, it's not necessary. You are a man and should be able to handle your own business. You are all done so it doesn't matter."

40. Barbara and Neal Higgins attempted to meet with the Athletic Director, Kathy Beauregard but she said that as far as she was concerned Brook hadn't been part of the team since the past fall and that there wasn't a disability problem.

41. The parents asked her why then was he working out with the team, going to the study table for athletes, receiving team emails and notices all the way through January 2013.

42. Despite trying to resolve these issues throughout the year in 2013, Brook Higgins was not allowed on the football team for 2013.

43. Despite having the highest GPA on the football team in fall of 2012 and still being on the football roster, Brook Higgins was not recognized for his academic achievements neither for the football banquet nor on the recognition list.

44. Despite continuing to work out with the team and having one of the highest GPA's on the football team, Brook Higgins was kicked off the football team for not alerting the coach of his illness.

5

45. Defendant WMU by and through their football staff continued on a systematic path of discrimination against Brook Higgins so they could eliminate him from the team.

46. The Defendant's coaches discrimination was ratified by the Athletic Director, Kathy Beauregard, who chose to ignore the fact that Brook was told he was on the team, worked out with the team and worked harder than most of the team in his academics.

47. Brook Higgins has been damaged by increased anxiety due to all of the problems at the Defendant WMU. He has been placed on Alprazolam for his anxiety and has been treated for this since these events with Defendants.

48. Defendant WMU continues to discriminate against a young man who despite his learning disabilities remains loyal to his team. Instead of acknowledging both his academic achievements and his athletic abilities, they continue to discriminate by allowing football players with inadequate academic scores and no disabilities to play football while excluding the Plaintiff.

## Defendant WMU's Duties under the ADA and Rehabilitation Act

49. Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §12131, bars public entities from excluding any qualified individual with a disability from participation in or the benefit of the services, programs or activities of the public entity on the basis of disability.

50. Under the ADA, an "individual with a disability" includes an individual who is "regarded as having....an impairment." 42 U.S.C. §12102(1)(c).

51. Under Title II of the ADA, *"a public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."* 28 C.F.R. § 35.130(d) (emphasis added).

52. Defendant WMU is subject to the requirements of the ADA because it is a "public entity" as defined in the statute. *See* 42 U.S.C. § 12131.

6

53. Section 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act") also prohibits covered entities from discriminating against persons with disabilities in the provision of benefits, services and or programs. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) states:

> No otherwise qualified individual with a disability in the United States....shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity....

54. Under the Rehabilitation Act, which incorporates by reference the definition of an "individual with a disability" in the ADA, an "individual with a disability includes an individual who is "regarded as having ....an impairment." 29 U.S.C. 705(20)(B); 42 U.S.C. §12102(1)(C).

55. And, like the ADA, the Rehabilitation Act requires that *"recipients [of federal financial assistance] shall administer programs or activities in the most integrated setting appropriate to the needs of qualified handicapped persons."* 28 C.F.R. § 41.51(d) (emphasis added).

56. Defendant WMU is subject to the Rehabilitation Act because it receives federal financial assistance.

57. Thus, WMU is prohibited from excluding individuals with disabilities from the participation in or the benefits of any of their programs, activities and/or services pursuant to Title II of the ADA and Section 504 of the Rehabilitation Act. *See* 42 U.S.C. §12131; 29 U.S.C. §794; *see also* 28 C.F.R. §§ 35.130(b), 42.503(a), 42.503 (b)(1)-(2).

58. Furthermore, Defendant WMU is required under Title II of the ADA and Section 504 of the Rehabilitation Act to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d); *see* 28 C.F.R. § 41.51(d).

7

## COUNT ONE – VIOLATION OF TITLE II
## OF THE AMERICANS WITH DISABILITIES ACT

Plaintiff reincorporates and re-alleges paragraphs 1-58 as if reinstated herein.

59. Title II of the ADA, 42 U.S.C. § 12132 bars public entities from discriminating against any qualified individual with a disability on the basis of disability and from excluding any qualified individual with a disability from "participation in or the benefits of the services, programs or activities of the public entity" on the basis of disability. 42 U.S.C. §§ 12131-12132.

60. In addition, a public entity is required to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). Thus, it is a violation of Title II of the ADA for a public entity to fail to administer services, programs, or activities to qualified individuals with disabilities in the most integrated setting appropriate to their needs.

61. Furthermore, public entities may not exclude a qualified individual with a disability from participation in or the benefits of their services, programs or activities whether "directly or through contractual, licensing or other arrangements." 28 C.F.R. § 35.130(b)(1); *see also* 28 C.F.R. §35.130(b)(3).

62. Defendant WMU is a "public entity" within the meaning of the ADA. *See* 42 U.S.C. §12131(1).

63. Plaintiff Brook Higgins is a "qualified Individual" within the meaning of the ADA, because he was educationally impaired.

64. Plaintiff Brook Higgins is a "qualified individual with a disability" within the meaning of the ADA. Under the ADA, and "individual with a disability" includes an individual who is "regarded as having…an impairment." 42 U.S.C. §12102 (1)(c).

8

65. By wrongfully and unnecessarily eliminating Plaintiff Brook Higgins from the football team without meeting with Brook and/or his parents or investigating into whether it was an appropriate expectation to have him text information to the coach, Defendant WMU has denied him of "participation in or the benefits of" the less restrictive placements to which he was entitled, on the basis of a failed text message.

66. Furthermore, by wrongfully excluded him from the athletic football team and ignoring his educational successes while giving banquets for other players with no disabilities and lower grade point averages, Defendant WMU has failed to provide Plaintiff Brook Higgins the programs and services to which he was entitled in the most integrated setting appropriate to his needs.

67. Further, in wrongfully segregating, and isolating Plaintiff Brook Higgins, Defendant WMU acted with deliberate indifference to his rights under the ADA.

68. Defendant WMU knew or had reason to know that Plaintiff Higgins had a learning disability.

**WHEREFORE,** the Plaintiff requests a judgment against the Defendants as a direct and proximate result of Defendants' wrongful acts and omissions Plaintiff has suffered mental anguish, physical and emotional distress, humiliation and embarrassment.

## COUNT TWO – VIOLATION OF SECTION 504 OF THE REHABILITATION ACT

Plaintiff reincorporates and re-alleges paragraphs 1-68 as if reinstated herein.

69. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) states:

> No otherwise qualified individual with a disability in the United States....shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity....

70. The Rehabilitation Act states that "recipients [of federal financial assistance] shall administer programs or activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d).

71. Furthermore, recipients of federal funds may not exclude a qualified individual with a disability from participation in or the benefits of any aid, benefit, or service, whether "directly or through contractual, licensing, or other arrangements." 28 C.F.R. § 41.51(b)(1); see also 28 C.F.R. § 41.51 (b)(3).

72. Defendant WMU receives federal financial assistance.

73. Plaintiff Brook Higgins was a qualified individual within the meaning of the Rehabilitation Act and qualified to receive related services in the least restrictive environment suitable to his needs.

74. Plaintiff Brook Higgins was a "qualified individual with a disability" within the meaning of the Rehabilitation Act. Under the Rehabilitation Act, an "individual with a disability" includes an individual who is "regarded as having…an impairment." 29 U.S.C. § 705(2))(B); 42 U.S.C. § 12102(1)(c).

75. By wrongfully and unnecessarily having Plaintiff Brook Higgins eliminated from the football team, Defendant NCCMH denied him "participation in or the benefits of" the athletic football programs to which he may have been entitled.

76. Furthermore, by, segregating, and isolating Plaintiff Brook Higgins,  Defendant WMU excluded him from the educational, social, familial and other opportunities available to other students who were not disabled or regarded as being disabled..

77. By wrongfully segregating, and isolating Plaintiff Brook Higgins, and kicking him off of the football team, but stating that it would have been different if he had "told them about his disability" Defendant WMU utterly failed to provide Plaintiff  Brook Higgins the programs and services to which he was entitled.

78. Further, in wrongfully segregating, and isolating Plaintiff RB, Defendant WMU acted with deliberate indifference to his rights under the Rehabilitation Act.

79. Defendant WMU knew or had reason to know that Plaintiff Brook Higgins had a disability and that the actions of their employees did not constitute placement in the most integrated setting possible.

**WHEREFORE,** the Plaintiff requests a judgment against the Defendants as a direct and proximate result of Defendants' wrongful acts and omissions Plaintiff has suffered mental anguish, physical and emotional distress, humiliation and embarrassment.

**WHEREFORE** Plaintiff, Brook Higgins, respectfully requests that this Court enter a judgment in favor of the Plaintiff against the Defendants as follows:

1. Legal relief
   a. compensatory damages in whatever amount Plaintiff is found to be entitled
   b. exemplary damages in whatever amount over $75,000 Plaintiff is found to be entitled
   c. an award of interest, costs, and reasonable attorney fees
   d. Liquidated damages in whatever amount he is found to be entitled.
   e. An award of interests, costs, and reasonable attorney fees and expert witness fees.

2. Equitable relief
   a. an award of interest, costs, and reasonable attorney fees
   b. an order enjoining Defendant from further acts of discrimination or retaliation
   c. whatever other relief appears appropriate at the time of final

11

judgment

d. whatever other relief may appear appropriate when this court's final order is entered.

Respectfully submitted,

**Fixel Law Offices, PLLC**

Dated: January 13, 2014

Joni M. Fixel (P56712)
Attorney for the Plaintiff

## VERIFICATION

I, Brook Higgins, have read and made this verified complaint and attest that those facts stated of my own knowledge are true and those matters stated of which I have been informed I believe to be true after reasonable inquiry.

Dated: 12/31/13

/s/ Brook Higgins

Brook Higgins

12